UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES,

Plaintiff,

v.

KELVIN BROWN,

Defendant.

_____/

Case No. 21-cr-20236

U.S. District Court Judge
Gershwin A. Drain

## OPINION AND ORDER DENYING RENEWED MOTION FOR REVOCATION OF DETENTION ORDER (ECF No. 32), DENYING AS MOOT MOTION TO SUPPRESS (ECF No. 30) AND AMENDED MOTION TO SUPPRESS (ECF No. 33), GRANTING IN PART AND DENYING IN PART SECOND AMENDED MOTION TO SUPPRESS (ECF No. 42), AND FINDING EXCLUDABLE DELAY

### I.   INTRODUCTION

On November 19, 2020, Defendant Kelvin Brown was subjected to a traffic stop for operating a vehicle with expired registration tags. ECF No. 42, PageID.293. Officers recovered a gun during the stop, and on April 7, 2021, Brown was charged in a one-count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1, PageID.1.

1

Presently before the Court are Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing (ECF No. 30), Renewed Motion for Revocation of Detention Order (ECF No. 32), Amended Motion to Suppress (ECF No. 33), and Second Amended Motion to Suppress (ECF No. 42).  These motions are fully briefed, and the Court held an evidentiary hearing on these matters on January 21, 2022 and oral argument on the motions on March 21, 2022.  For the following reasons, the Court will **DENY** Defendant's Renewed Motion for Revocation of Detention Order (ECF No. 32), **DENY AS MOOT** Defendant's Motion to Suppress (ECF No. 30) and Amended Motion to Suppress (ECF No. 33), and **GRANT IN PART AND DENY IN PART** Defendant's Second Amended Motion to Suppress (ECF No. 42).

## II.   FACTUAL & PROCEDURAL BACKGROUND

### A. Factual Background

On November 19, 2020, Brown was stopped by Detroit Police officers Paris Johnson and Yousseif Berro for driving with expired registration tags.  Police Report, ECF No. 37-2, PageID.277.  Officer Johnson approached Brown in the driver's seat and asked for his license, registration, and proof of insurance.  Johnson Body Worn Camera, Gov Ex. 2 at 00:51-00:54.  While Brown was retrieving his documents, Officer Johnson asked if he had any contraband or weapons in his car,

2

which Brown denied.  *Id.* at 00:58-01:02.  Brown was able to provide his driver's license.  *Id.* at 01:05.  Officer Johnson asked if Brown had proof of insurance and registration because his "plate was expired."  *Id.* at 01:08-01:18.  Brown then showed Johnson a couple documents that Officer Johnson explained were not proof of insurance.  *Id.* at 01:07-2:25.

When Officer Johnson approached Brown at the beginning of the traffic stop, Officer Berro approached the passenger side of the vehicle, where Brown's female companion was sitting.  Berro Body Worn Camera, Gov. Ex. 3 at 00:47-1:00.  While Officer Johnson and Brown were speaking, Officer Berro had Brown roll down the rear windows.  *Id.* at 1:08.  During the evidentiary hearing, Officer Berro clarified that he requested the windows be rolled down because he could not determine how many people were in the car due to the dark tint.  Officer Berro looked into the rear passenger window several times before returning to the police car.  *Id.* at 1:14-02:27. While Brown looked for his proof of insurance, Officer Johnson returned to the police car with Brown's driver's license.  Johnson Body Worn Camera, Gov Ex. 2 at 02:25.  When Officer Johnson entered the vehicle, Officer Berro told him there was "a flashlight to a gun" on the "backseat where [Brown's] clothes [were]."  *Id.* at 02:35-02:48.  When Officer Johnson left the police car, Officer Berro remained to

3

run Brown's information through the database.  Berro Body Worn Camera, Gov. Ex. 3 at 02:43-03:26.

Officer Johnson returned to Brown's window, where Brown provided him another document that was not Brown's proof of insurance.  Johnson Body Worn Camera, Gov Ex. 2 at 02:53-03:12.  He then asked again whether Brown had any weapons in the vehicle, which Brown again denied.  *Id.* at 03:13-03:18.  After looking in the rear driver's side window, Officer Johnson asked whether there were "weapons of any kind in [the] backseat."  *Id.* at 03:20-03:26.  Brown responded he had just gotten into the vehicle to drop his friend off.  *Id.* at 03:26-03:30.  Officer Johnson asked two more times, stating the last time he would be "pissed" if he searched the vehicle and found a weapon.  *Id.* at 03:30-03:42.  In response, Brown conceded he had "a gun for protection."  *Id.* at 3:40-03:47.  Officer Berro retrieved the firearm from the backseat.  Berro Body Worn Camera, Gov. Ex. 3 at 03:49-04:01.

Officer Johnson directed Brown to step out of the vehicle, handcuffed him, and moved him to stand near the police car.  Johnson Body Worn Camera, Gov Ex. 2 at 03:48-04:10.  As they walked towards the car, Brown stated he was "just being honest."  *Id.* at 04:07-04:09.  Officer Berro taunted Brown for thinking he was "slick" and "trying to hide it."  Berro Body Worn Camera, Gov. Ex. 3 at 04:12-

4

04:16.  Brown reiterated that he had the gun for protection and stated he had recently been robbed.  Johnson Body Worn Camera, Gov Ex. 2 at 04:20-04:35.  Officer Berro then berated Brown for not telling them about the gun initially, stating, *inter alia*, he was "pissed" and "going to fucking tear up this car," that Brown had "tried to play it smart," and that he does not "play around with that bullshit."  *Id.* at 04:35-04:51.  Officer Berro asked Brown if he had a concealed pistol license, and Brown confirmed he did not.  *Id.* at 04:54-04:57.  Officer Johnson then informed Brown he was "going to jail" for carrying a concealed weapon.  *Id.* at 05:01-05:10.

Brown began pleading with Officer Johnson regarding his arrest and continued to do so while Officer Johnson searched his person.[1]  Officer Johnson then placed Brown in the backseat of the police car, where he continued to plead with the officers while they periodically tried to calm him down.  Backseat Camera, Gov. Ex. 4 at 06:39-06:45, 07:05-08:27, 08:57-10:47, 11:21-11:30, 12:03-15:24.  At one point, Officer Berro asked Brown if he was aware he had an outstanding probation violation, which Brown confirmed.  Berro Body Worn Camera, Gov. Ex. 3 at 12:40-12:52.

---

[1] The Government has stated it will not introduce statements Brown made while standing on the roadway after he was told he was under arrest (Johnson Body Worn Camera, Gov. Ex. 2 at 5:05-6:35) or any statements Brown made while seated in the police car after timestamp 15:24 on Government Exhibits 2, 3, or 4.  Thus, the Court does not address any statements made after that point.

## B. Procedural Background

On May 4, 2021, Magistrate Judge Kimberly G. Altman held a detention hearing to determine Defendant's custody status.  ECF Nos. 7, 8.  Magistrate Judge Altman concluded by a preponderance of the evidence "that no condition or combination of conditions of release [would] reasonably assure the defendant's appearance as required."  ECF No. 9, PageID.13.  Specifically, she found, *inter alia*,

> that Defendant: (1) has a demonstrated history of violence against women and children; (2) was on probation for child abuse at the time of the instant offense; (3) had violated the terms of his probation by the instant offense and by engaging in other criminal activity, including (a) threatening the mother of some of his children with a gun which appears to match the one involved in the instant offense (b) reportedly involved in the sexual assault of another woman at his home where the victim observed a gun and was afraid defendant would hurt her (although there do not appear to be any pending charges).

*Id.* at PageID.14.  Additionally, the Magistrate Judge expressed concern that Brown and his girlfriend reported to Pretrial Services that he lives in different places.  *Id*.

Defendant first moved for revocation of the detention order on May 18, 2021.  ECF No. 13.  He offered William Wilson, a U.S. Army veteran, as a third-party custodian, *id.* at PageID.57, and argued the Magistrate Judge improperly relied on offenses of which Brown had been charged rather than convicted, *id.* at PageID.70.

6

This Court conducted a *de novo* review of the detention order.  ECF No. 26. The Court agreed that the Magistrate Judge placed too much emphasis on Brown's criminal history but nevertheless found "upon careful consideration of the four factors under § 3142(g)," that even "including consideration of Defendant's proposed third-party custodian, . . . no condition, or combination of conditions of release, [would] reasonably assure the safety of other persons and the community." *Id.* at PageID.202.  Specifically, the Court expressed concern that, according to Brown, he had been living with Wilson when he committed several of his prior probation violations.  *Id.* at PageID.206.  Furthermore, the Court noted inconsistencies between Wilson's affidavit (ECF No. 13-1) and the Bureau of Alcohol, Tobacco, Firearms and Explosives' Report of Investigation ("ATF Report") (ECF No. 18-2). *Id.*  The Court thus denied Defendant's motion.  *Id.* at PageID.210.

### III.    RENEWED MOTION FOR REVOCATION OF DETENTION ORDER

Presently before the Court is Brown's Renewed Motion for Revocation of Detention Order.  ECF No. 32.  Brown offers a new third-party custodian in support of his Motion: Darnell Woodall, a Data Center Engineer with J.P. Morgan Chase Bank and retired Sergeant First Class of the U.S. Army.  *Id.* at PageID.224-25.  He also reiterates his arguments that the Bail Reform Act factors enumerated in 18

7

U.S.C. § 3142(g) support his release.  *Id.* at PageID.228-34.  The Government counters that "the proposal of another third-party custodian should not alter the Court's analysis" from its Opinion and Order Denying Defendant's first Motion for Revocation of Detention Order.  ECF No. 35, PageID.248.

### A. Legal Standard

A defendant must be detained pending trial if the court determines, after conducting a hearing, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  However, the court may reopen the hearing at any time prior to trial if it finds "that information exists that was not known to the movant at the time of the hearing" and the information "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f)(2).

"Because this motion is a renewed motion for bond before the Court, the standard is no longer a '*de novo*' review from a magistrate judge's order detaining a defendant."  *United States v. Shabazz*, No. 14-20339, 2015 WL 7770856, at *1 (E.D. Mich. Dec. 3, 2015).  The defendant must show truly changed circumstances or a significant event."  *United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *1

8

(6th Cir. May 21, 2020) (citing *United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991) (per curiam); *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989); *United States v. Peralta*, 849 F.2d 625, 626−27 (D.C. Cir. 1988) (per curiam)). Further, "[t]he new information must be of a nature that would increase the likelihood that the defendant will appear at trial and would show that the defendant is less likely to pose a danger to the community." *United States v. Hamilton*, No. 16-20062, 2016 WL 11647740, at *1 (E.D. Mich. July 26, 2016) (citing *United States v. Watson*, 475 F. App'x 598, 600 (6th Cir. Apr. 13, 2012)).

### B. Discussion

The "new information" Brown presents in support of his Renewed Motion for Revocation of Detention Order is a new third-party custodian.  Notably, other than stating Woodall's current employment and history with the U.S. Army, Defendant makes no argument as to why he would serve as a suitable third-party custodian. *See generally* ECF No. 32.  Further, unlike the previously proposed custodian, Woodall has not submitted an affidavit in support of his ability to take on this role.  This "new information" is thus *not* of a nature that . . . would show that the defendant is less likely to pose a danger to the community." *Hamilton*, 2016 WL 11647740, at *1 (citing *United States v. Watson*, 475 F. App'x 598, 600 (6th Cir. Apr. 13, 2012)). *Cf. United States v. Alderson*, No. CR 18-20512, 2019 WL 926604, at *2 (E.D. Mich.

9

Feb. 26, 2019) ("Alderson has offered evidence that, if released on supervision, a third-party custodian (his paternal aunt Debra Alderson) could supervise him in the home he owns in St. Clair Shores, Michigan."). Indeed, the Court agrees with the Government that the mere name and employment history of the newly proposed custodian does not alter its prior analysis of the 18 U.S.C. § 3142(g) factors. Accordingly, the Court will **DENY** Brown's Renewed Motion for Revocation of Detention Order (ECF No. 32).

## IV.   MOTION TO SUPPRESS EVIDENCE

Brown asserts several violations of his Fourth and Fifth Amendment rights through a Motion to Suppress Evidence and Request for Evidentiary Hearing (ECF No. 30), Amended Motion to Suppress (ECF No.33), and Second Amended Motion to Suppress (ECF No. 42). Because Defendant's arguments in his first and Amended Motions to Suppress are reiterated in the Second Amended Motion to Suppress, the Court will consider the merits of the Second Amended Motion to Suppress and **DENY** the previous two Motions as **MOOT.**

First, Brown avers the officers unlawfully prolonged the traffic stop beyond the time reasonably required to complete its purpose based on their hunch that there was a firearm in the vehicle, in violation of the Fourth Amendment. ECF No. 42, PageID.302-04. Next, Brown contends evidence of the firearm is not admissible

10

under the plain view exception to the Fourth Amendment's warrant requirement because it was not immediately apparent the flashlight Officer Berro observed was evidence of illegal activity. *Id.* at PageID.304-05. Finally, Brown maintains he was subjected to a custodial interrogation regarding the presence of a firearm in the vehicle, without being given his *Miranda* warnings, in violation of the Fifth Amendment. *Id.* at PageID.306-08.

The Government opposes Defendant's Motion. ECF No. 45. First, the Government asserts the traffic stop was properly limited in scope because Officer Johnson questioned Brown regarding his registration, which the officers suspected was expired, and weapons in the vehicle, which are relevant to officer safety. *Id.* at PageID.325. It further argues the extraneous questioning was properly limited in duration because, cumulatively, it lasted approximately 30 seconds, and the officers place Brown under arrest within five minutes of initiating the traffic stop. *Id.* at PageID.326. Second, the Government avers Officer Berro saw a "tactical firearm flashlight" through the open rear passenger window, which he associated with a firearm; Officer Johnson questioned Brown in response to Officer Berro's observation; and Officer Berro recovered the firearm after Brown admitted to its presence on the backseat. *Id.* at PageID.327-28. Moreover, the Government contends officers would have inevitably discovered the firearm when the vehicle

11

was subject to an inventory search after being impounded due to Defendant's traffic violations. *Id.* at PageID.328. Finally, the Government maintains roadside questioning of motorist detained during a traffic stop does not constitute custodial interrogation necessitating *Miranda* warnings, and Defendant's post-arrest statements were spontaneous, and thus not the subject of interrogation. *Id.* at PageID.329.

In reply, Brown asserts the purpose of the stop was to cite him for having expired registration tags, which can be determined prior to approaching the vehicle, so the purpose of the stop was complete as soon as he was pulled over and informed of the reason for the stop. ECF No. 46, PageID.334. Moreover, Brown argues, the officers discussed the tactical flashlight after obtaining his driver's license, so further engagement was unnecessary. *Id.* Additionally, Brown contends a tactical flashlight need not be mounted on a gun, so its presence is not an inherent indicium of criminality. *Id.* at PageID.335. Finally, Brown maintains he was subject to a custodial interrogation and repeated questioning about a firearm that "had absolutely no relation to a traffic stop." *Id.* at PageID.337.

12

### A. Law & Analysis

### 1. Alleged Fourth Amendment Violations

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. Amend. IV.  A search occurs "[w]hen the Government obtains information by physically intruding on persons." *Florida v. Jardines*, 569 U.S. 1, 5 (2013).  A search conducted without a warrant is "per se unreasonable," subject only to specifically established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967); *see also United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996).  A seizure occurs when "under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (internal citation omitted).

An ordinary traffic stop by the police is a "seizure" within the meaning of the Fourth Amendment. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  The police's detention of a vehicle's occupants also constitutes a "seizure." *United States v. Hill*, 195 F.3d 258, 263 (6th Cir. 1999).  "Accordingly, any evidence seized during an illegal traffic stop must be suppressed as 'fruits of the poisonous tree.'" *Blair*, 524 F.3d at 748 (quoting *Hill*, 195 F.3d at 264).  A seizure is legitimate if "probable cause of a civil infraction

13

or reasonable suspicion of criminal activity" exists at the time of the stop.  *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (internal citation omitted).

### i. Prolonged Detention

Brown does not contest the officers had probable cause to stop the vehicle for the expired registration tags.  *See, e.g.*, ECF No. 46, PageID.337.  Instead, he argues the purpose of the traffic stop—to cite Brown for driving with expired registration tags—was complete when the officers informed Brown why he was being pulled over.  ECF No. 46, PageID.334.

A seizure that is lawful at its inception "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  Thus, a "seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  *Id.*  "A lawful traffic stop must therefore be limited in scope and duration."  *United States v. Whitley*, No. 20-1955, 2022 WL 1561329, at *3 (6th Cir. May 18, 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).  Nevertheless, "the Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention."  *Rodriguez*, 575 U.S. at 354 (citing *Arizona v. Johnson*, 555 U.S. 323, 327–28 (2009); *Caballes*, 543 U.S. at 406).

14

Specifically, the traffic stop must not be "prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket" and the "unrelated inquiries [must] not measurably extend the duration of the stop." *Id.* at 354-55 (cleaned up) (citing *Caballes*, 543 U.S. at 407; *Johnson*, 555 U.S. at 333).

The Supreme Court has recognized that in addition to determining whether to issue a traffic ticket, an officer's "mission" during a traffic stop "includes 'ordinary inquires incident to [the traffic] stop'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (alteration in original) (quoting *Caballes*, 543 U.S. at 408). The Fourth Amendment also permits "an officer . . . to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at 356. In contrast, "measure[s] aimed at 'detect[ing] evidence of ordinary criminal wrongdoing[ ]'" lack "the same close connection to roadway safety as the ordinary inquiries" and are thus "not fairly characterized as part of the officer's traffic mission." *Id.* at 355–56 (second alteration in original) (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)).

However, an officer "may conduct certain unrelated checks" that prolong the traffic stop if he has "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. Reasonable suspicion requires

15

more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.  If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop.

*Lyons*, 687 F.3d at 763 (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir.2008)).  Reasonable suspicion must be considered "under the totality of the circumstances, considering 'all of the information available to law enforcement officials at the time.'"  *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir.2007) (quoting *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir.2003)).  Officers are entitled "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *U.S. v. Arvizu*, 534 U.S. 266, 276 (2002), *overruled in part on other grounds by Davis v. Washington*, 547 U.S. 813 (2006) (internal quotation marks omitted).

Brown's argument is unavailing.  The Supreme Court has explicitly recognized that part of an officer's "mission" during a traffic stop includes "inspecting the automobile's registration and proof of insurance."  *Rodriguez*, 575 U.S. at 355.  Brown never provided proof of insurance nor explicitly told officers that he could not do so.  Indeed, he was still looking for the necessary documents

16

when Officer Berro identified the tactical flashlight and informed Officer Johnson of its existence. Thus, Officer Berro's actions to this point did not prolong the traffic stop "beyond the time reasonably required to complete [its] mission." *Caballes*, 543 U.S. at 407. Likewise, Officer Johnson's initial questions about the firearm upon returning to Brown's window did not prolong the traffic stop because Officer Berro was still running Brown's name through the database until he exited the police car. *United States v. Howard*, 815 F. App'x 69, 75 (6th Cir. 2020) ("[A]n officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he or another officer is completing a task related to the traffic violation.") (alteration in original) (quoting *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010)).

At the point the Officer Berro stopped running Brown's name through the database and exited the police car, however, the officers "totally abandoned their investigation of the traffic violation." *Id.* at *5. Nonetheless, Officer Johnson's questioning after this point was still constitutional because both he and Officer Berro had a reasonable suspicion of criminal activity. *See Rodriguez*, 575 U.S. at 355; *see also Howard*, 815 Fed. App'x. at 76 ("'A seizure can be extended' for reasons outside the initial scope of the traffic stop 'if something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity

17

is afoot.'") (quoting *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020)) (internal quotation marks omitted).  Relying on his partner's statements regarding his observations, which are discussed in greater detail in Section IV.B.2 *infra*, Officer Johnson had a reasonable suspicion Brown had a firearm in the backseat of his vehicle.  His additional thirty seconds of questioning on that topic were well within the bounds of the Fourth Amendment.  *Cf. United States v. Bah*, 794 F.3d 617, 627 (6th Cir. 2015) ("[I]f an officer possesses a reasonable suspicion that a suspect is armed and dangerous, he may conduct a brief protective sweep of the suspect's vehicle, so long as that search is constrained to places where a weapon may be hidden.") (quoting *United States v. Graham*, 483 F.3d 431, 439–40 (6th Cir.2007)) (alteration in original).  Accordingly, Defendant's prolonged detention argument fails.

### ii.   Plain View Exception

As discussed in Section IV *supra*, Brown he asserts that the warrantless seizure of the firearm does not satisfy the criteria for the plain view exception to the Fourth Amendment's warrant requirement.  Specially, he disputes that a tactical flashlight carries an inherent indicium of criminality and argues Officer Berro only had a hunch there was a firearm in the car.  ECF No. 42, PageID.304.  The Government, however, does not seek to justify the seizure based on the plain view

18

exception.  Instead, it maintains that the firearm was seized pursuant to Brown's admission that he had a weapon in the back of his vehicle.  ECF No. 45, PageID.327.

Once Brown stated he had a firearm in the vehicle, the limited search to retrieve the firearm and the actual seizure of the weapon were lawful under the Fourth Amendment.  *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) ("[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.") (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

To the extent Defendant intended to argue Officer Berro lacked reasonable suspicion of criminal activity because the tactical flashlight is not inherently criminal, the Court disagrees.  Officer Berro explicitly identified the tactical flashlight as part of a gun and directed Officer Johnson to look for a firearm on the backseat.  That the tactical flashlight was peeking out of clothes in the backseat, as if it had been hastily concealed lends credence to Officer Berro's inference that it was attached to a gun and not just a loose flashlight.  Given Officer Berro's level of certainty when speaking to Officer Johnson about his observation, this was not "a

19

mere fishing expedition."  ECF No. 42, PageID.304. Instead, the situation is better characterized as an officer's "experience and specialized training" allowing him to "make inferences . . . that might well elude an untrained person."  *Arvizu*, 534 U.S. at 276.   Moreover, the actions the officers took to investigate their reasonable suspicion—an additional thirty seconds of questioning while Brown was still in his vehicle—was reasonably limited in scope given the situation.  *See United States v. Torres-Ramos*, 536 F.3d 542, 551–52 (6th Cir. 2008) ("[W]hether the degree of intrusion . . . was reasonably related in scope to the situation at hand, [] is judged by examining the reasonableness of the officials' conduct given their suspicions and surrounding circumstances.") (second alteration in original) (quoting *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir.2006)).   Accordingly, Defendant's plain view argument also fails.

## 2.  Alleged Fifth Amendment Violation

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation.  *Id* at 467.  "To counteract the coercive pressure, *Miranda* announced that police officers must warn a suspect prior

20

to questioning that he has a right to remain silent, and a right to the presence of an attorney." *Maryland v. Shatzer*, 559 U.S. 98, 103–04 (2010) (citing *Miranda*, 384 U.S. at 444). "Statements obtained during custodial interrogation in violation of *Miranda* may not be admitted for certain purposes in a criminal trial." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003).

Brown contends he was subject to a custodial interrogation because he was not free to leave and Officer Johnson "repeatedly badgered and used threatening and coercive measures to elicit a response" from him. ECF No. 42, PageID.307. Thus, Brown maintains all his unmirandized statements must be suppressed. *Id.* at PageID.308. The Government counters that Brown's "rights under the Fifth Amendment and *Miranda* attached when officers told [him] he was under arrest" and that the statements he made while sitting in the police car were voluntary and not the product of interrogation. ECF No. 37, PageID.262.

### iii.   Pre-arrest statements

The Government maintains Brown's pre-arrest statements should not be suppressed because he was not "in custody" for purposes of *Miranda* at that time.

*Miranda* warnings are only required when a suspect is subjected to a custodial interrogation. *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013) (citations omitted). Given the "noncoercive aspect of ordinary traffic stops," the Supreme

21

Court has held that "persons temporarily detained pursuant to such stops are not 'in custody' for purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).  However, the *Berkemer* Court declined to impose a bright-line rule applicable to all traffic stops.  *See id.* at 441.  Thus, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*."  *Id.* at 440 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).

Whether a defendant was "in custody" is a mixed question of fact and law that turns on whether there has been either "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."  *Swanson*, 341 F.3d at 529 (citation and internal quotation marks omitted).  In deciding *Berkemer*, the Supreme Court contrasted that "ordinary" traffic stop with that of the motorist in *Commonwealth v. Meyer*, 488 Pa. 297, 412 A.2d 517 (1980), who was detained at the side of the road for over a half-hour, part of the time in a patrol car, and the motorist in *United States v. Schultz*, 442 F. Supp. 176, 180 (D. Md. 1977), who was subjected to persistent questioning, both next to and in the squad car, about drinking alcohol and smoking marijuana and denied permission to contact his mother, both

22

of whom were held to have been "in custody" for purposes of *Miranda*.   *See*

*Berkemer*, 468 U.S. at 441 n. 34, n. 36.

Factors a court considers when determining whether an ordinary traffic stop

has transformed into a custodial situation include:

> (1) whether a reasonable person in the defendant's position would have
> felt free to leave; (2) the purpose of the law enforcement questioning;
> (3) whether the place of the questioning was hostile or coercive; (4) the
> length of the questioning; and (5) other indicia of custody such as (a)
> whether the defendant was informed at the time that the questioning
> was voluntary or that the suspect was free to leave; (b) whether the
> defendant possessed unrestrained freedom of movement during
> questioning; (c) and whether the defendant initiated contact with the
> police or acquiesced to their requests to answer questions.

*United States v. Jimenez-Robles*, 98 F. Supp. 3d 906, 916 (E.D. Mich. 2015) (citing

*Swanson*, 341 F.3d at 529).

Here, after evaluating the totality of the circumstances, the Court concludes

Brown became in custody for purposes of *Miranda* when he was handcuffed, moved

away from his female companion, and directed to stand next to the police car.  While

the handcuffs did not, by themselves, constitute a formal arrest, they were

undoubtedly a "restraint on freedom of movement of the degree associated with

formal arrest."   *Swanson*, 341 F.3d at 529 (citation and internal quotation marks

omitted).  Additionally, several of the *Swanson* factors counsel finding that Brown

23

was in custody.  First, by the time Brown was handcuffed, no reasonable person in his position would have felt free to leave.  Furthermore, the purpose of the officer's questioning after placing Brown in handcuffs was to establish that he had violated Michigan's statute against carrying a concealed weapon.   While the place of questioning was not necessarily coercive, the question about whether Brown had a concealed pistol license came right after Officer Berro berated and swore at him, lending to the coercive atmosphere.  This is further evidenced by the fact that Brown became visibly distressed and began pleading with Officer Johnson only seconds after this exchange with Officer Berro.  Moreover, at no time was Brown informed that the questioning was voluntary, nor did anything about the situation give the appearance that he could decline to answer.  Finally, although Brown stated he was "just being honest" with the officers, he cannot reasonably be said to have acquiesced to their requests to answer questions when he was asked repeatedly if he had a weapon in his vehicle despite firm denials.  *See Berkemer*, 468 U.S. at 438 (comparing "questioning incident to an *ordinary* traffic stop" to a "station house interrogation, . . . in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.") (emphasis added).

Accordingly, the Court holds Brown was "in custody" for purposes of *Miranda* from the time he was handcuffed (Johnson Body Worn Camera, Gov Ex. 2

24

at 03:59) and his subsequent pre-arrest statements in response to the officers must be suppressed.  *See United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) ("Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right.").

### iv.   Post-arrest statements

The Government argues Brown's post arrest statements should not be suppressed because they were not made in response to police interrogation.  *See Berkemer*, 468 U.S. at 434 ("There can be no question that respondent was 'in custody' at least as of the moment he was formally placed under arrest and instructed to get into the police car.").

"Interrogation," in the *Miranda* context, encompasses "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Woods*, 711 F.3d at 740-41 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  Thus, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by" the holding in *Miranda*.  *Miranda*, 384 U.S. at 478.

Upon review of the body worn camera videos, the backseat camera video, and the testimony presented at the evidentiary hearing it is clear the vast majority of

25

Brown's statements from the back of the police car were not made in response to officer interrogation. Indeed, the only questions the officers asked him was whether he wanted to take the cash in his truck with him to jail, whether he wanted a cigarette, and whether he was aware he had an outstanding probation violation. Otherwise, they attempted to calm him down and repeatedly explained that his situation was not as dire as he believed.

Thus, the Court will suppress Brown's statement in response to Officer Berro's question about his probation violation (Berro Body Worn Camera, Gov. Ex. 3 at 12:40-12:52). None of his other statements are subject to suppression.

## V. CONCLUSION

Accordingly, for the reasons articulated above, **IT IS HEREBY ORDERED** that Defendant's Renewed Motion for Revocation of Detention Order (ECF No. 32) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress (ECF No. 30) and Amended Motion to Suppress (ECF No. 33) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendant's Second Amended Motion to Suppress is **GRANTED IN PART AND DENIED IN PART** (ECF No. 42). Specifically, the Motion is **GRANTED** as to all Brown's statements made after he was placed in handcuffs and prior to his arrest (Johnson Body Worn Camera, Gov

26

Ex. 2 at 03:59-5:05) and as to Brown's response to Officer Berro's question about his probation violation (Berro Body Worn Camera, Gov. Ex. 3 at 12:40-12:52); the Motion is **DENIED** as to the firearm retrieved from Brown's vehicle, the statements he made prior to being handcuffed, and the other statements he made from inside the police car.

Finally, the Court is aware Defense Counsel intends to file a motion to withdraw now that the Motion for Revocation of Detention Order and Motion to Suppress have been resolved. The Court will hold a hearing on that motion on **July 13, 2022 at 2:00 p.m.** Thus, **IT IS FURTHER ORDERED** that the Court **EXCLUDES** May 26, 2022 through July 13, 2022 from the Speedy Trial Clock while the motion to withdraw is being resolved. *See* 18 U.S.C. § 3161(h)(1)(D).

**IT IS SO ORDERED**.

/s/ Gershwin Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated: May 26, 2022

27

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 26, 2022, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager